UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY BASANSKY,                                   Case No. 10-13649

        Plaintiff,                          District Judge Mark A. Goldsmith

v.                                               Magistrate Judge R. Steven Whalen

SANILAC COUNTY SHERIFF
DEPUTY PARK, ET AL.,

        Defendants.
_____/

### REPORT AND RECOMMENDATION

On September 14, 2010, Plaintiff Mary Basansky filed a *pro se* civil rights complaint under 42 U.S.C. § 1983, naming as Defendants Sanilac County Sheriff's Deputies Park, Darrin Siemen, Deputy Sgt. James Johnson, Sgt. Robert Willis, Detective Ruggles, and Terry Stone, a civilian described in the complaint as a "volunteer." On November 22, 2010, counsel entered an appearance on Plaintiff's behalf. Before the Court at this time is Defendants' motion for summary judgment [Doc. #25], which has been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, I recommend that the motion be GRANTED.[1]

### I.   FACTS

In her complaint, Plaintiff alleges that on September 15, 2008, the Defendant Sheriff's Deputies entered her residence without a warrant and without probable cause, and unlawfully seized property, including a number of firearms as well as cash and

---

[1] This matter will be submitted on the written pleadings without oral hearing. E.D. Mich. Local Rule 7.1(f)(2).

jewelry, all in violation of her rights under the Fourth Amendment. Her complaint contains two counts: a § 1983 count based on the alleged constitutional violation, and a second count of "gross negligence."

Although the complaint lacks detail as to the specific facts on which it is based, discovery materials, including depositions, have fleshed out the underlying events. Attached to Defendants' motion are the deposition transcripts of the Defendants and the Plaintiff, and the incident reports of the Sheriff's Deputies. The Plaintiff has also submitted her own affidavit as an exhibit to her response.

The Defendant Deputies testified consistently with the incident reports that were filed. Detective Sgt. Johnson recorded the following events in his report (Def. Exh. 11). On September 15, 2008, he was requested to assist in executing an arrest warrant for Walter Basansky, the Plaintiff's adult son, who was holed up at the Basansky residence in Croswell, Michigan. The Plaintiff was 75 years old at the time. She informed Det. Johnson that the day before, on September 14, Walter had threatened her with a knife and threw a chair toward her. According to Det. Johnson, Plaintiff said that Walter told her that "maybe it was a good day for her to die." Plaintiff left the residence and went to the home of Defendant Terry Stone, a neighbor. Mr. Stone called the Sheriff's Department, and the report states that he "indicated that Walter Basansky was making repeated calls for his mother and was agitated that she was not at home. Walter Basansky also threatened Stone on the phone and implied that if the police showed up at his house they would need a fire department." *See also Johnson Deposition (Defendants' Exhibit 3)*, at 39 (deputies had information that there was a threat of a fire).

According to Det. Johnson, the Plaintiff told him that Walter had firearms in the house, and that because of his training in the military, that would make him dangerous.

-2-

Johnson made several calls to the house in order to speak with Walter, but Walter would either not answer the telephone or hang up. Eventually, at around 2:00 p.m. on September 15, Johnson did talk briefly with Walter, informing him that there was a complaint of assault on his mother. Walter said to not bother him for an hour, and hung up. Johnson called again about 20 minutes later. In his report, he states, "There was concern about personal harm to him or that the subject may be preparing to do damage to the home (his threat of a fire) or even an assault on law enforcement. The phone rang several times and Walter did anser. His only comment was, 'I told you not to call me for an hour.' When this officer tried to ask him what he needed an hour to do, he again hung up." Shortly thereafter, Walter pulled out of the garage in a full size Dodge pickup truck. Johnson states that a "crash occurred in the driveway by the garage parking pad and the subject Walter Basansky was secured and arrested." The Plaintiff "was requested to stay at the residence belonging to Terry Stone until officers were able to secure the residence."

Sgt. Robert Willis' report is attached to Defendants' motion as Exhibit 10. He stated that Deputies were attempting to arrest Walter Basansky at his mother's home on September 14, 2008, but that Walter would not answer the door or the telephone. A decision was made to let the situation diffuse until the following morning, giving Walter the opportunity to calm down. Sgt. Willis stated that the Plaintiff told the Deputies that Walter had a number of weapons inside the house, and that Walter had assaulted her. On September 15, Terry Stone, the neighbor, told Sgt. Willis that Walter had threatened him on the telephone, and that Walter said "that if the Police showed up, they better bring the fire department with them." Over the next several hours, the Deputies attempted unsuccessfully to contact Walter by telephone. Finally, around 2:00 p.m., Det. Johnson made contact with Walter. Shortly thereafter, Walter was observed putting objects in the

back of a Dodge pickup truck. He then pulled out of the garage and drove down the driveway. Sgt. Willis and two other deputies in fully marked patrol cars attempted to stop him. Sgt. Willis described what happened next as follows:

> "Upon seeing Deputies, WALTER immediately placed his vehicle into reverse and backed down the driveway at a high rate of speed toward the garage. Sgt. Willis then followed WALTER in the driveway. As WALTER reached the concrete approach of the garage, he stopped the vehicle, placed it into drive and came toward Sgt. Willis. The vehicle then struck the fully marked Sanilac County Patrol Unit that was being driven by Sgt. Willis. Both vehicles came to a stop and WALTER exited his vehicle. During that time Dep. Park and Det. Ruggles had their weapons drawn and were ordering WALTER to the ground where he continued to struggle during the attempt to handcuff him. During this time, WALTER spit directly in the face and eyes of Dep. Darrin Siemen. Following WALTER being handcuffed, he began complaining of back pain and stated that he wanted medical treatment. An ambulance was dispatched and WALTER was transported to McKenzie memorial Hospital for treatment."

Sgt. Willis also noted that "[t]here was extensive front end damage caused to Sanilac County Patrol Unit 307," and that photographs were taken. Included with Defendants' Exhibit 4 (Deposition of Deputy Ruggles) are three photographs showing the silver pickup truck having collided with the patrol car. The photographs show extensive damage to the front end of the patrol car.

Following Walter's arrest, Deputy Nowiski and other members of the Sheriff's Special Response Team conducted a warrantless protective sweep of the house. *Nowiski Deposition, Defendants' Exhibit 8*, 16-21. Nowiski testified that they entered, or "cleared" the house to look for victims "or any kind of contraptions, bombs, just making sure it's safe." *Id.* 16-17. They were in the house for no more than five minutes. *Id*. Afterward, the Plaintiff arrived at the house with her other son, Alex Basansky. Sgt. Johnson testified that the Plaintiff showed him and Det. Ruggles into the house. *Johnson Deposition, Defendants' Exhibit 3*, 39-40. He stated that the Plaintiff expressed concern about the high-powered rifles and other firearms that were in the house, and that she

helped the Deputies look for them. Although neither Sgt. Johnson nor any other Deputy testified that they asked the Plaintiff permission to enter the house, he testified that the Plaintiff showed them into the house, that she did not give any indication that she objected to their presence in the house, and that she never asked them to leave the house. *Id.* 40-41.

Det. Ruggles testified that he, Sgt. Johnson and some other officers went into the house with the Plaintiff "to secure the weapons that were in the residence." *Ruggles Deposition, Defendants' Exhibit 4*, at 41. He testified that he believed that the Plaintiff gave consent to enter the home and search for weapons, but that she did not give explicit verbal consent. He did not ask her for consent to search, and she never explicitly said that the Deputies could search her home. *Id.*, 50-51. He testified as follows as to his belief that he had consent based on the Plaintiff's actions:

> Q (by Plaintiff's counsel): She never gave you verbal consent or written consent to go into her home?
>
> A: –she wanted the weapons secured.
>
> Q: Okay. So the answer is I'm correct in saying–would I be correct in saying that she did not give you verbal or written consent?
>
> A: She never gave us written. Verbal, I mean, the gesture of going in. I mean, I mean, we walked in with her. She comes–you know, come on.
>
> Q: Okay.
>
> A: She wanted the weapons out.
>
> Q: But the words never came out of her mouth that you were allowed to search her home?
>
> A: She actually took us to places in her home.
>
> Q: Okay. But just if you could answer the question.
>
> A: I did. She took us to places. She took us down to the basement.

Q: Did she ever–

A: (Interposing) she walked with us.

Q: Did you ask her if we can search your home?

A: No.

Q: I understand you're saying–

A: (Interposing) I mean, as far as–no.

\*                                             \*                                             \*

Q (by Defendants' counsel): She gave you the appearance she allowed you into her house, correct?

A: Yes.

Q: Okay. She took you to various parts of the house, correct?

A: Yes.

Q: She told you she wanted the weapons secured, correct?

A: Yes.

Q: She told you she wanted the weapons out of the home, correct?

A: Yes.

Q: She took you to the location where the weapons were being stored, correct?

A: She took us to the locations where she thought there could be weapons, yes.

*Id.* 50-53.

A number of firearms were seized, and Plaintiff was advised that they could be returned if deemed appropriate. On January 12, 2009, the Sanilac County Prosecutor authorized the release to Plaintiff of all firearms that had been seized.

The Plaintiff testified that when she returned to the house, after Walter had been arrested, Sgt. Johnson and some other Deputies were in her garage, and followed her into

the house. She said that they did not ask if they could enter. She did not tell them to leave, but she thought her son Alex may have asked them to leave, and that Alex said, "What are you looking here for? You know there's no more guns in here. Leave." *Plaintiff's Deposition, Defendants' Exhibit 1*, 98-100. She states that she went through the house, but did not see any guns anywhere. *Id*. 100. At one point in her deposition, the Plaintiff acknowledged that she gave the Deputies permission to go through her house, but then backtracked on that statement:

> Q: Okay. Did he (Johnson) ask you for permission to come in the house?
>
> A: No.
>
> Q: Did you let them into the house?
>
> A: They said something, they were going to see or something, but–I don't know.
>
> Q: *And what did you say?*
>
> A: *I shouldn't have given permission to go through my house, no.*
>
> Q: *You did give them permission at first?*
>
> A: *No.*
>
> Q: *You never did?*
>
> A: *No. Whatever I might have said, if I was upset and that, but–*
>
> Q: Didn't you just say, "I shouldn't have given them permission"? Is that what you just said a minute ago?
>
> A: Oh, no. I didn't say that.
>
> (The court reporter reads back the questions and answers)
>
> Q: That's not what you said–
>
> A: No.
>
> Q:–because she took something else down.

> A: No. Listen, you got good question, ask me. Otherwise, don't try and confuse me, okay?

*Id*., 102-103 (emphasis added).

The Plaintiff also testified that $3,000.00 in cash and some jewelry was missing, and when asked whether she was accusing the Deputies of stealing these items, she said, "I don't accuse any specific one," and "If I can't find them, somebody took them." *Id*., 106-107. When asked again whether she "want[ed] to accuse any of these officers of stealing," she replied, "I want to know what happened to my stuff. That's all." *Id.* 111.

The Plaintiff also submitted her affidavit as Exhibit A to her response [Doc. #29]. She states that she "called Terry Stone to talk to my son Walter because I could not get through on the phone." *Id.* ¶ 1. Notwithstanding the photographs showing the Dodge pickup truck rammed into the patrol car, with extensive damage to the front end of the patrol car, Plaintiff states "[t]hat my son Walter did not ram his pick-up truck into the Sanilac scout car." *Id.* ¶ 3. She also denies giving the Deputies permission to enter her home or asking them to secure the firearms. *Id.* ¶¶ 17, 18.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).  To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990). Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added). If, after sufficient opportunity for discovery, the non-moving party cannot meet that burden, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

### III.   DISCUSSION

#### A.   Count I: § 1983 Claim

##### 1.   Principles of Qualified Immunity

The Sheriff's Deputy Defendants argue that as state actors, they are protected by qualified immunity. Qualified immunity is an affirmative defense. A state official is protected by qualified immunity unless the Plaintiff shows (1) that the Defendant violated

a constitutional right, and (2) the right was clearly established to the extent that a reasonable person in the Defendant's position would know that the conduct complained of was unlawful. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The constitutional right in question, however, cannot be a generalized right. "It must be clearly established in a 'particularized' sense, so that 'the contours of the right' are clear enough for any reasonable official in the defendants' position to know that what the official is doing violates that right." *Danese v. Asman,* 875 F.2d 1239, 1242 (6th Cir. 1989)(citations omitted). *See also Myers v. Potter*, 422 F.3d 347, 356 (6th Cir.2005) ("[W]e do not assess the right violated at a high level of generality, but instead, we must determine whether the right [is] 'clearly established' in a more particularized ... sense"); *Martin v. Heideman*, 106 F.3d 1308, 1312 (6th Cir.1997) ("Because most legal rights are 'clearly established' at some level of generality, immunity would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that an official had 'clearly' violated").

Under *Saucier*, the inquiry was sequential, requiring the district court to first consider whether there was a constitutional violation. However, in *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), the Supreme Court held that the two-step sequential analysis set forth in *Saucier* is no longer mandatory. Rather, *Pearson* commended the order of inquiry to the judge's discretion, to be exercised on a case-by-case basis:

> "On reconsidering the procedure required in *Saucier,* we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

*Pearson*, 129 S.Ct. at 818.

In this case, the Plaintiff alleges four discrete violations of her Fourth Amendment rights: (1) the initial protective sweep of her house after Walter was arrested; (2) the Deputies' second warrantless entry after when she returned to the house; (3) the seizure of her firearms; and (4) the taking of her money and jewelry. I will discuss each in turn.

## 2.     The Protective Sweep

The Plaintiff claims that the Deputies violated her Fourth Amendment right to be free from a warrantless search of her home. Clearly, the Fourth Amendment prohibits the warrantless entry of an individual's home, "whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990). However, a well-established exception to the warrant requirement comes into play where exigent circumstances are present. In *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994), the Sixth Circuit, citing relevant Supreme Court authority, described four circumstances that would satisfy the exigent circumstances exception: (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) need to prevent a suspect's escape; and (4) risk of danger to police or others. It is the last scenario–risk of danger–on which these Defendants rely. The test for the presence of such circumstances is "whether the police had 'an urgent need' or 'an immediate major crisis in the performance of duty affording neither time nor opportunity to apply to a magistrate.' " *United States v. Johnson,* 802 F.2d 1459, 1461 (D.C.Cir.1986) (quoting *Dorman v. United States,* 435 F.2d 385, 391 (D.C.Cir.1970) (en banc)).

While the Plaintiff may equivocate as to whether she told the Deputies that Walter had access to guns in the house, it is undisputed that Terry Stone provided this information. Of course in *Johnson*, the Court held that the presence of guns did not by itself excuse the warrant requirement once the suspect was in custody. ("We conclude no

exigent circumstances existed to justify the warrantless seizure of the guns. Once the police had freed Angela Skinner, the police had ample time to secure the premises and to obtain a search warrant."). *Id.* 22 F.3d at 680. Here, however, the officers had more. Specifically, they had information from Terry Stone that Walter had intimated he would start a fire if the police showed up. They knew that Walter had some kind of military training, and that he told Det. Johnson not to call him back for an hour. This would have given him sufficient time to rig an explosive or incendiary device before he attempted to flee by ramming a police cruiser with his pickup truck.

Courts have found that where the police have a reasonable, objective basis to believe that an explosion or fire might endanger themselves or others, they may perform a warrantless protective search. *See Olaniyi v. District of Columbia*, 763 F.Supp.2d 70 (D.D.C. 2011) (warrantless search of a van appropriate where officers observed unmarked containers of liquid inside); *United States v. Duran,* 884 F.Supp. 552, 556 (D.D.C.1995) (quoting *United States v. Lindsey,* 877 F.2d 777, 781 (9th Cir.1989)) (" 'Exigent circumstances are frequently found when dangerous explosives are involved'"); *United States. v. Tucker*, 57 F.Supp.2d 503, 517 (W.D.Tenn. 1999) (second ammunition box properly opened and searched without warrant where the first box contained a hand grenade). And as *Olaniyi*, 763 F.Supp.2d at 103, held, "[w]hen law enforcement personnel are 'confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act on that information, even if ultimately found erroneous.'" (Quoting *Wayne v. United States,* 318 F.2d 205, 212 (D.C.Cir.1963)).

Under the totality of the circumstances, the Deputies were justified in conducting their brief protective sweep of the house under the "exigent circumstances" exception to

the warrant requirement, and no reasonable jury could find otherwise. Because the Defendants did not violate Plaintiff's Fourth Amendment rights, they are entitled to qualified immunity.

As a separate matter, I also note that none of the named Defendants is alleged to have participated in the protective sweep.

### 2.    Consent Search

As to the second warrantless entry into the house by Sgt. Johnson and others, the Defendants claim that they had the Plaintiff's consent. The consent exception to the warrant requirement provides that "[c]onsent from an individual whose property is to be searched or from a third party who possesses common authority over the premises validates a search that would otherwise be considered unreasonable and unconstitutional." *Shamaeizadeh v. Cunigan,* 338 F.3d 535, 547 (6th Cir.2003). Whether there is a valid consent "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973).

In this case, the Defendants concede that they did not ask the Plaintiff for consent to enter the house, and that she did not verbally give them permission to enter. Instead, they posit that her gestures, her failure to object, her request for them to remove the guns, and the fact that she accompanied them throughout the house to look for the guns, amounts to implied consent.

In a recent unpublished Sixth Circuit case, *United States v. Little*, 431 Fed.Appx. 417, 420-421, 2011 WL 2518674, *3 (6th Cir. 2011), the Court recognized that "we have found valid consent can occur not just by words but by gesture or conduct as well." (Citing *United States v. Carter,* 378 F.3d 584, 587 (6th Cir.2004) (en banc)). However, *Little* distinguished *Carter* because in the latter case, the police asked for permission to

-13-

enter the defendant's hotel room, whereas in *Little*, the officers made no explicit request, and instead "merely followed Defendant into the house when Defendant went in to get additional clothing." Other Circuits have held that when an officer does not request consent to search, such consent cannot be inferred from an individuals silence or mere acquiescence. *See Roe v. Texas Dept. of Protective and Regulatory Services*, 299 F.3d 395, 402 (5th Cir. 2002). Under a strict application of *Little*, the Plaintiff's challenge to the entry into her house is well taken.

However, even assuming a Fourth Amendment violation, the second prong of the qualified immunity analysis–whether the right in question was clearly established–weighs in the Defendants' favor. The question is whether the law was clearly established that consent could not be implied from other circumstances where the police did not explicitly request consent, and whether a reasonable officer should have known so. The answer is no. The *Little* case was decided some three years after the search in this case, and even then was decided in an unpublished opinion. In addition, the Court in *Little* acknowledged that "this circuit has not considered whether the totality of the circumstances can ever support a finding of implied consent in the absence of an explicit request for permission." *Id*. at 4. *See also United States v. Attar*, 1990 WL 102876, *2 (6th Cir. 1990) (declining to "reach the question of whether mere silence can constitute implied consent to a search"). The only law that was clearly established, by *Schneckloth v. Bustamonte* and numerous other cases, was that consent was to be determined under the totality of the circumstances. Under the facts of this case, these Defendants did not unreasonably violate clearly established Fourth Amendment principles.

Moreover, the Plaintiff did much more than merely step aside or let the Deputies follow her into the house. She concedes that she accompanied them through the house

looking for weapons. At one point in her deposition, she ruefully conceded, "*I shouldn't have given permission to go through my house*." When she tried to back away from that statement, she tellingly said, "*Whatever I might have said, if I was upset and that, but....*" In other words, the Plaintiff is acknowledging that while she might not have subjectively wanted to give consent, she may have given the Deputies an objective basis to believe that she did consent. That would of course be consistent with Sgt. Johnson's testimony that he inferred consent from the Plaintiff's gestures and other conduct, including a request to remove the guns from the house.

The Defendants reasonably believed that they had the Plaintiff's consent to enter the house and search for weapons, but even if they were wrong in that belief, they did not violate clearly established law. In *Pearson v. Callahan*, *supra*, 555 U.S. at 231, the Supreme Court stated:

> "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' *Groh v. Ramirez,* 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (KENNEDY, J., dissenting) (quoting *Butz v. Economou,* 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), for the proposition qualified immunity covers 'mere mistakes in judgment, whether the mistake is one of fact or one of law).'"

The Court has also held that qualified immunity " 'provides ample support to all but the plainly incompetent or those who knowingly violate the law.' " *Burns v. Reed*, 500 U.S. 478, 494-95, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). The Defendants in the present case are entitled to qualified immunity.

### 3.  Seizure of the Guns

Sgt. Johnson testified that the Plaintiff expressed concern about the weapons that were in the house, and that she helped them locate the guns. He also testified that the guns were taken with the Plaintiff's permission. *Johnson Deposition*, 37-38. The Plaintiff denies expressing concern, but concedes that she accompanied the Deputies when they searched for the weapons. She signed the inventory for the weapons. And as noted above, she testified that she regretted giving consent to search.

Under the totality of the circumstances–and notwithstanding certain conflicts in the testimony–Sgt. Johnson had a reasonable belief, grounded in objective facts, that he and the other Deputies had the Plaintiff's consent to take the weapons, just as they reasonably believed that they had consent to enter the house. Even if he was subjectively wrong, his actions were at most a mistake in judgment, which would be protected by qualified immunity. *Pearson, supra*.

### 4. The Money and the Jewels

Sgt. Johnson testified that neither he nor the other Deputies took anything from the Plaintiff's house other than what was listed on the property inventories, that is, the guns. The Plaintiff has offered no evidence whatsoever, beyond her own speculation, that any of these Defendants took her cash or her jewelry. In fact, she testified at her own deposition that "I don't accuse any specific one," and "If I can't find them, somebody took them," and concluded by saying, "I want to know what happened to my stuff. That's all." No reasonable juror could find for Plaintiff on this claim.

### 5. Terry Stone

Demonstrating that no good deed goes unpunished, Plaintiff has sued Terry Stone, the neighbor who gave her shelter and called the police on her behalf. To prevail on a § 1983 claim, the Plaintiff must prove that the violation of her constitutional rights "was

caused by a person acting under color of state law." *Boykin v. Van Buren Twp.,* 479 F.3d 444, 451 (6th Cir.2007) (quoting *Tahfs v. Proctor,* 316 F.3d 584, 590 (6th Cir.2003)). Mr. Stone is a private citizen, not a state actor.

I recognize that "[i]f a private party has conspired with state officials to violate constitutional rights, then that party qualifies as a state actor and may be held liable pursuant to § 1983...." *Cooper v. Parrish,* 203 F.3d 937, 952 n. 2 (6th Cir.2000); *see also Revis v. Meldrum,* 489 F.3d 273, 292 (6th Cir.2007) ( "[C]laims of conspiracies between private and state actors, *if adequately alleged*, generally suffice to establish state action on the part of the private actors for the purpose of deciding a motion to dismiss")(emphasis added). In this case, however, all Mr. Stone did was call Walter, call the police, and provide information as to what he knew. There was no conspiracy, nor has Plaintiff "adequately alleged" a conspiracy between Mr. Stone and the Deputies. In *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987), the Court stated the well-settled rule "that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." There must be something more than a defendant's personal belief that he is the victim of retaliation or conspiracy. *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997).

In short, apart from the absence of a constitutional violation, there is no basis to hold Mr. Stone, a private citizen, liable on a § 1983 claim.

### B. Gross Negligence

In Count II, the Plaintiff brings a state law claim of "gross negligence." However, the relevant Michigan statute, M.C.L. 691.1407(2), provides immunity to state actors from tort liability unless their actions are grossly negligent. It does not create a cause of

action separate from an underlying § 1983 claim. *See VanVorous v. Burmeister*, 262 Mich.App. 467, 483, 687 N.W.2d 132 (2004) (rejecting plaintiff's claim of "gross negligence" as a cause of action where the claim "is fully premised on her claim of excessive force"); *Livermore v. Lubelan*, 476 F.3d 397, 408 (6th Cir. 2007) (noting that "Michigan courts have consistently 'rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence'")(quoting *VanVorous*).

Moreover, even assuming that the Plaintiff's underlying Fourth Amendment claim is not considered an "intentional tort" that would bring it within the purview of *VanVorous,* no rational juror could find the Defendants' conduct to be grossly negligent. "Gross negligence" means "'conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.'" *Odom v. Wayne Co,* 482 Mich. 459, 469; 760 NW2d 217 (2008), quoting MCL 691.1407(7)(a). Gross negligence involves "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Tarlea v. Crabtree,* 263 Mich.App 80, 90; 687 NW2d 333 (2004). The evidence, even viewed in the light most favorable to the Plaintiff, falls far short of demonstrating a wilful disregard of substantial risks.

## IV.   CONCLUSION

For these reasons, I recommend that the Defendants' motion for summary judgment [Doc. #25] be GRANTED, and that the complaint be DISMISSED WITH PREJUDICE.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D.

Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                                  s/ R. Steven Whalen
                                                  R. STEVEN WHALEN
                                                  UNITED STATES MAGISTRATE JUDGE

Date: February 8, 2012

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on February 8, 2012.

                                                  s/Johnetta M. Curry-Williams
                                                  Case Manager